IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JULIO A. MORALES (01),

    Defendant.

Case No. 14-40136-01-DDC

**MEMORANDUM AND ORDER**

On September 5, 2014, police arrested defendant Julio A. Morales after a search of the car he was driving revealed 1.1 pounds of suspected MDMA, $71,020.00 in cash, and eight firearms, among other things. Mr. Morales filed this motion seeking to suppress (Doc. 15) all evidence discovered in his vehicle. The Court held a hearing on Mr. Morales' motion on March 16, 2015, after which both parties submitted supplemental briefs (Docs. 27, 28). After considering the arguments and evidence that the parties have presented, the Court denies Mr. Morales' motion.

    **I.  Facts**

The Court takes the following facts from the parties' briefs and the evidence presented at the March 16 hearing, including a video of the traffic stop and subsequent search taken by a dashboard camera ("dashcam") mounted in the arresting officer's patrol car.

On September 5, 2014, at around 6:28 p.m., Junction City Police Officer Nicholas Blake was driving in his marked police cruiser on Interstate 70 near mile marker 310 in Geary County, Kansas. Barney, Officer Blake's certified narcotics detection canine partner, accompanied him in the cruiser. Officer Blake was driving westbound in the left lane of the highway when he

1

noticed a gray sedan heading the same direction in the right lane about 150 yards ahead of him. Two other vehicles trailed behind the gray sedan in the right lane. Later, Officer Blake learned that Mr. Morales was driving the gray sedan.

The westbound lanes of I-70 bend to the right near mile marker 309. As the highway curves, an exit lane abutting the right lane of traffic gradually forms, which leads to a highway rest stop. As Mr. Morales passed the curve, Officer Blake saw the tires on the right side of Mr. Morales' car cross first onto the fog line on the right side of the road and then, after the fog line gave way to the exit lane, onto the line marking the exit lane. Mr. Morales' vehicle never crossed completely over the fog line or exit lane line. Rather, the right two tires merely touched the lines once, for a short time. Officer Blake testified at the hearing that Mr. Morales drove on the lines for "about three seconds." Then, Mr. Morales corrected course and returned to the right lane of traffic without jerking or swerving.

Officer Blake believed that Mr. Morales' brief encounter with the line marker constituted a violation of K.S.A. § 8-1522. This statute requires a driver to stay "as nearly as practicable" within a single lane of traffic. Officer Blake testified that there were no adverse driving or weather conditions when he saw Mr. Morales' car that would cause him to drift onto the lane line. The sky was overcast, but visibility was good, the road was dry, and there were no high winds. He saw no obstructions in the road near Mr. Morales' vehicle.

Officer Blake accelerated and pulled alongside Mr. Morales' car to determine how many occupants were in the vehicle and to see whether they were wearing seatbelts. Mr. Morales, the lone occupant of the car, was wearing his seatbelt. Officer Blake then dropped back behind Mr. Morales' car in the right lane and activated his emergency lights. Mr. Morales pulled his vehicle onto the side of the highway near mile marker 308. Half of his car was on the shoulder of the

road, while the other half was on a grass embankment that sloped away from the road.  The government concedes that the single, brief instance when Officer Blake saw Mr. Morales touch the line marker was the only incident it relies on to justify the traffic stop.

Officer Blake exited his vehicle and approached Mr. Morales' car.  After some discussion, Officer Blake asked Mr. Morales to come back to his patrol car so he could run checks on Mr. Morales' license and prepare a warning citation.  While in the vehicle, Officer Blake talked with Mr. Morales and became suspicious that he was involved in criminal activity.  He ordered Mr. Morales to stay in the police cruiser while he took Barney, his canine partner, to conduct a drug sniff of Mr. Morales' car.

Officer Blake walked a leashed Barney around Mr. Morales' car in a counter-clockwise direction, starting with the front driver-side corner of the vehicle.  As he moved, Officer Blake pointed at the car to indicate where he wanted Barney to sniff.  When they passed the driver-side doors, Barney jumped up twice, but they continued around the trunk and along the passenger side of the car.  Officer Blake begins to disappear from view of the dashcam as he leads Barney along the passenger side of the car; the ground dips to the right on the side of the highway where Mr. Morales parked his vehicle, and the car partially obscures both Officer Blake and Barney.  When Barney reached the seam between the front and rear passenger-side doors, he paused briefly and then sat on the ground.  Sitting down is Barney's normal "indication" to Officer Blake that he has identified drug odors in the vehicle.  When Barney sat down, Officer Blake almost simultaneously stooped, at least slightly, so that he disappears completely from the view of the camera.  He then stood up and jogged Barney back to the police cruiser, telling Barney "good boy" at least twice as he does so.  The entire search lasted about 20 seconds.

Officer Blake returned to the patrol car and called for backup. When backup arrived, the officers searched Mr. Morales' vehicle. In the trunk of the car, they discovered: a black container containing suspected cocaine and marijuana wax; a vacuum-sealed pouch containing $71,020.00 in cash; eight firearms; a large suitcase containing two large empty duffel bags and two rolls of food saver bags; and a bag containing approximately 1.1 pounds of suspected MDMA inside three vacuum-sealed bags. The officers then arrested Mr. Morales.

## II. Analysis

Mr. Morales argues that the Court should suppress evidence discovered in his vehicle for three reasons: (1) Officer Blake lacked any justification for stopping Mr. Morales' car; (2) Barney's sniff search did not provide probable cause to search the car; and (3) Barney's alert and indication to the smell of drugs on the passenger side of the car did not provide probable cause the search the trunk. The Court addresses each argument in turn.

### A. Was the traffic stop justified at its inception?

#### 1. Legal standard

The Fourth Amendment to the United States Constitution protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). "[T]o justify this type of seizure, officers need only 'reasonable suspicion'—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Id.* (quotation omitted). Put differently, a traffic stop is justified at its inception if an officer has "an objectively reasonable articulable suspicion that a traffic violation has occurred." *United States v. Barraza-Martinez*, 364 F. App'x 453, 457 (10th Cir. 2010) (quotation omitted).

4

Courts look to the "totality of the circumstances" to determine whether reasonable suspicion exists. *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011). This is an objective inquiry, and an officer's subjective motivation for the stop plays "no role" in the reasonable suspicion analysis under the Fourth Amendment. *United States v. Harmon*, 742 F.3d 451, 456 (10th Cir. 2014) (quotation omitted). Rather, courts ask "whether facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *McHugh*, 639 F.3d at 1256 (quotation omitted).

**2. Discussion**

The government advances three justifications for the initial decision to stop Mr. Morales' car: (1) Mr. Morales violated K.S.A. § 8-1522 when he drove onto the fog line and exit lane line; (2) Mr. Morales violated K.S.A. § 8-1548 because he began a lane change without signaling first; and (3) it was a valid "public safety" stop. The Court need not address the government's second and third purported justifications because Officer Blake had reasonable suspicion that Mr. Morales violated § 8-1522.

K.S.A. § 8-1522 provides:

Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules in addition to all others consistent herewith shall apply:

> (a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

It is undisputed that the stretch of I-70 where Mr. Morales was driving has been divided into two or more marked lanes for traffic, so § 8-1522 applies here. The government argues that when Officer Blake saw Mr. Morales drive slightly onto the fog line and exit lane line a single time for about three seconds, he had reasonable suspicion that Mr. Morales violated § 8-1522. Based on

the Kansas Supreme Court's decision in *State v. Marx*, 215 P.3d 601 (Kan. 2009), Mr. Morales contends that one, momentary lane breach does not justify a stop under § 8-1522.

In *Marx*, a sheriff's deputy pulled over a mobile home after he saw it cross the fog line, overcorrect, and cross the centerline, before returning fully into its lane of traffic. *Id.* at 612. The deputy witnessed no other incident justifying a stop, but he believed that the single lane breach, by itself, constituted a violation of § 8-1522. *Id.* The Kansas Supreme Court disagreed. Section 8-1522 requires driving "as nearly as practicable" entirely within a single lane of traffic. According to the Kansas Supreme Court, this language "contradicts the notion that any and all intrusions upon the marker lines of the chosen travel lane constitute a violation." *Id.* Rather, § 8-1522 requires only "compliance that is *close* to that which is feasible." *Id.* (emphasis in original). The Kansas Supreme Court concluded that "a violation of K.S.A. 8-1522(a) requires more than an incidental and minimal lane breach." *Id.*

Citing this language, Mr. Morales argues, "*Marx* rejected the notion that *any* contact with a lane marker will support a traffic stop." Doc. 15 at 4 (emphasis in original). But Mr. Morales misreads *Marx*. As the Tenth Circuit has explained: "*Marx* rejected the notion that every intrusion upon a lane's marker lines gives rise to reasonable suspicion, but also stopped short of holding that a single swerve can never amount to reasonable suspicion." *Barraza-Martinez*, 364 F. App'x at 457. "Rather, the *Marx* court held that under the circumstances, and given the record's complete silence as to the driving conditions and how far the vehicle crossed over marker lines, the state had failed to carry its burden of establishing the deputy had a reasonable suspicion of a violation of § 8-1522(a)." *Id.* Indeed, the *Marx* court faulted the prosecution because it offered no testimony about how far the motor home crossed either the fog line or the centerline, no testimony about the traffic conditions at the time of the lane breach, and no

6

testimony "from which the court could even infer that it was practicable to maintain a single lane." *Marx*, 215 P.3d at 613.  The Kansas Supreme Court concluded:  "Accordingly, *from the record before us*, we determine that the State failed to carry its burden of establishing that" the deputy had reasonable suspicion that the defendants had violated § 8-1522.  *Id.* (emphasis added).

The record is not so limited here.  Mr. Morales drifted onto, but not over, the fog and exit lane line for just three seconds.  But he did so in good driving conditions.  Although the sky was overcast, visibility was excellent, the road was not wet, and Officer Blake testified that there was no significant wind at the time he observed Mr. Morales drive onto the fog line.  Officer Blake saw no obstruction in the road which could have caused Mr. Morales to drift out of his lane.  Significantly, neither of the two cars trailing Mr. Morales crossed onto the line.  Thus, unlike in *Marx*, there is evidence in the record from which the Court can conclude that "it was practicable to maintain a single lane."  *Id.* at 613.  Under these circumstances, it was reasonable for Officer Blake to suspect that Mr. Morales had violated § 8-1522.  As a result, the Court concludes that the initial traffic stop was justified.  Because § 8-1522 provides sufficient justification for the stop, the Court need not consider the government's alternative justifications, *i.e.*, that Mr. Morales violated K.S.A. § 8-1548 or that it was a valid "public safety" stop.

### B. Did the canine alert provide probable cause to search Mr. Morales' car?

#### 1. Legal standard

Under the Fourth Amendment, "police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *United States v. Clarkson*, 551 F.3d 1196, 1202-03 (10th Cir. 2009) (quotation omitted).  "A police officer has probable cause to conduct a search when the facts available to him would

7

warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (quotation omitted).  In evaluating whether the government has met this practical and common-sense standard, the Supreme Court looks to the "totality of the circumstances."  *Id.*

In *Florida v. Harris*, the Supreme Court addressed how a court should determine if a drug-detection dog's alert during a traffic stop provides probable cause to search a vehicle.  *Id.* at 1053.  Answering this question, the Court concluded that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."  *Id.* at 1057.  "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."  *Id.*  The Court held that the government had presented sufficient evidence to conclude that the drug-detection dog was reliable.  *Id.* at 1058. The dog had completed a 120-hour training program in narcotics detection offered by a local police department, had obtained a certification from an independent company, and had worked weekly on exercises to keep his detection skills sharp.  *Id.*  The dog in *Harris* performed at the "highest level" in these trainings."  *Id.*

The Court cautioned, however, that a defendant must have an opportunity to challenge evidence of a dog's reliability, "whether by cross-examining the testifying officer or by introducing his own fact or expert witness."  *Id.* at 1057.  Also, "even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions."  *Id.* at 1057-58.  When the defendant has challenged the reliability of canine alert, "the court should weigh the competing evidence."  *Id.* at 1058.

### 2. Discussion

Mr. Morales argues that Officer Blake's actions, not the smell of drugs, caused Barney to "alert" on the passenger side of Mr. Morales' car. As a result, according to Mr. Morales, the sniff search was not reliable and did not provide probable cause to search his car. In assessing probable cause based on a dog search, *Harris* instructs courts to consider first whether a particular dog performs reliably in detecting drugs in controlled settings. *Id.* at 1058. Next, where, as here, the defendant challenges a particular search, the Court should evaluate and weigh the competing evidence. *Id.*

The government has presented sufficient evidence to show that Barney reliably detects drugs in controlled settings. In October 2013, Officer Blake and Barney completed 100 hours of narcotics detection training with Code 2 K-9 Services, LLC, an independent training company. Edward J. Van Buren, a retired police officer and owner of Code 2, has extensive experience training canine teams and is certified as a PSP Patrol/Narcotics Detection Dog Evaluator, a PSP Patrol/Narcotics Detection Dog Instructor, and a PSP Patrol/Narcotics Detection Dog Judge. The training consisted of 16 "drug finds," using marijuana, cocaine, methamphetamine, and heroin. These drug finds included numerous odor distractions (*e.g.*, dog food, gas and oil, and coffee) and occurred in different locations (*e.g.*, a barn, a bathroom, and vehicles). Upon completion, Mr. Van Buren certified Officer Blake and Barney as having "successfully completed 100 hours of Patrol/Narcotics Detection Training." At the hearing, Officer Blake testified that Barney had to achieve a certain level of performance, in spite of the distractions, to receive this certification. Officer Blake and Barney also complete annual maintenance trainings.

Mr. Morales does not contest the quality of Officer Blake's and Barney's training. However, Mr. Morales argues that other evidence shows that Officer Blake influenced Barney's

9

alert here, rendering it unreliable.  Because Mr. Morales challenges the validity of the search, the Court must weigh the competing evidence.  *Id.*

Mr. Morales relies primarily on the affidavit and testimony of his expert, Andre Falco Jimenez, to support his argument that Officer Blake improperly caused Barney to alert to the smell of drugs.  Mr. Jimenez is a former police officer with more than 20 years' experience handling and training drug-detection dogs.  He has owned his own drug-detection dog training business since 2001 and has been recognized as an expert witness on the topic of narcotics dog training and handling in numerous courts.  Mr. Jimenez formed his opinion about the validity of the drug sniff in this case by watching the video of the search taken from the dashcam on Officer Blake's police cruiser.  From the video, Mr. Jimenez concludes that "[i]t appears that the handler influenced the dog to alert in this search."  Doc. 15-1 at 1.  As a result, he believes the search was "not a valid dog search or use of the dog."  Transcript of the March 16, 2015 Hearing ("Transcript") at 137.

Mr. Jimenez identified several factors supporting his conclusion.  First, he said that in his career he has seen "hundreds of dogs" who alerted because their handlers inadvertently had caused their canine partners to do so.  Doc. 15-1 at 2.  He cited a published study that tested the accuracy of drug sniffs in a controlled environment and concluded that "[h]uman more than dog influences affected alert locations."  *See* Lisa Lit et al., *Handler Beliefs Affect Scent Detection Dog Outcomes*, 14 Animal Cognition 387 (May 2011).  Mr. Morales also cites this study in his motion to suppress.

Second, Mr. Jimenez discussed several aspects of the particular search here that show, in his view, that Officer Blake, not the smell of drugs, caused Barney to alert.  As outlined above, Officer Blake walked Barney in a counter-clockwise direction around the Mr. Morales' car.

10

When Barney reached the seam between the passenger-side doors, he sat down on the ground, his indication to Officer Blake that he smelled drug odors in the car. Mr. Jimenez described Officer Blake as holding Barney on a short leash. The problem with a short leash, according to Mr. Jimenez, is that it "does not allow the dog to perform his duty, which is to actively sniff the seams and the crevices of the car. The handler [is] essentially moving the dog through the search because the leash is so short and tight." Transcript at 139.

Mr. Jimenez also noted that Barney jumped up and down several times and moved quickly around the vehicle. This was significant to him because: "A dog who is trained by me and other trainers that effectively sniffs a vehicle is stopping and sniffing the seams, the wheel well, the gas cap lid . . . . None of that was done in this case. The dog simply was just moving up and down." Transcript at 142. Mr. Jimenez noted that Officer Blake was pointing at the car, and Barney was "simply just responding to the hand of" Officer Blake. Transcript at 143.

Mr. Jimenez then focused on the moment when Barney sat down, his signal to Officer Blake that he smelled drug odors. Before a drug-detection dog "indicates" the smell of drug odors (here, by sitting), the dog "alerts" to the smell. An alert is the dog's natural response when he first picks up the smell of drugs he was trained to detect. Mr. Jimenez argues that too little time elapsed between the moment when Barney reached the seam of the passenger doors and when he sat down for him to pick up the odor, discount other, non-drug odors, and then indicate to Officer Blake. Furthermore, Mr. Jimenez stated: "Suddenly [Officer Blake] ducked down out of view near the front passenger quarter panel and at the same time the dog sat in the area of the passenger door." Doc. 15-1 at 1. According to Mr. Jimenez, this is "a clear indication the dog is responding to the handler, not to the presence of the odor." Transcript at 145. Finally, Mr. Jimenez criticizes Office Blake for rewarding Barney by saying "good boy" at the end of the

11

search.  Mr. Jimenez states:  "That tells me the dog has been rewarded for performing this specific behavior [*i.e.*, alerting] and NOT because he has located one of the aforementioned odors and alerted."  Doc. 15-1 at 2.

Officer Blake addressed many of the points raised by Mr. Jimenez.  He said that he ascribed very little significance to the length of the leash—he varies the length of the leash depending on the circumstances present, like dangerous traffic.  Officer Blake testified that Barney often jumps up and down when searching cars, and the fact that Barney did so in this case has little significance to him.  Officer Blake did not find it important that Barney's alert and indication happened so quickly.  He said he had seen Barney alert and indicate just as quickly in other searches.  According to Officer Blake, Barney's natural alert is to become rigid and to sniff intensely.  Officer Blake testified that he observed Barney alert, albeit briefly, as he reached the passenger-side doors of Mr. Morales' car:  Barney paused, stopped wagging his tail, and sniffed the seam between the doors intently.

Officer Blake said that when he noticed the alert, he kept moving "until I [could] physically no longer move any farther unless I pull[ed] on [Barney] and that's to give him the [indication] that I'm still going.  But he didn't let me go because he sat down and said, 'No, we don't need to go, Dad, the odor is right here.'"  Transcript at 164.  Officer Blake stated that he disappeared from camera view not because he moved suddenly, but because the ground was sloping away from the car and he was stooping slightly to indicate to Barney where to sniff, as he had done before in the search.  He concluded that he believed that probable cause existed to search Mr. Morales' car because Barney "indicated and alerted to the drug odor being present outside the vehicle" in a way that was consistent with Barney's training and certification.  Transcript at 165.

12

The Court has reviewed the video of Barney's sniff search.  After considering this evidence, the witnesses' testimony, and the parties' arguments, the Court concludes that Barney's alert and indication provided Officer Blake with probable cause to search Mr. Morales' car.  As discussed above, the government produced evidence showing that Barney performs reliably in identifying drugs in controlled settings.  Under *Harris*, this evidence weighs in favor of finding that probable cause existed.  133 S. Ct. at 1058.

As for the sniff search itself, Mr. Jimenez, Mr. Morales' expert, argues that Barney's leash is so short that Officer Blake essentially is controlling Barney's movement around the vehicle.  However, the video of the search does not show this.  While Officer Blake walked quickly around the car and Barney closely followed, it appears that there is almost always slack in the leash, so that Officer Blake never had to tug Barney with the leash.  Also, when Barney paused at the passenger-side doors, Officer Blake testified that Barney stopped and refused to move, even as the leash became taut.  This indicates that Barney was not responding to the leash.  The Court does not believe the length of the leash played a significant part in Barney's alert and indication.

Mr. Jimenez also asserts that Barney displayed no alert behavior and simply was responding to Officer Blake's "sudden" movement when he gave his indication that he detected drug odors in Mr. Morales' car.  In Mr. Jimenez' view, this indicates that Barney simply was responding to Officer Blake's movements when he gave his indication.  However, the critical moment—when Barney sits down—is in large part obscured from the view of the dashcam by Mr. Morales' car.  Only the rear half of Barney's body is visible and Officer Blake drops completely out of view.  For this reason, the Court is inclined to give more weight to Officer

Blake's testimony; he had a clear, close view of Barney, whereas Mr. Jimenez relied entirely on the imperfect view provided by the video.

Officer Blake testified that as he passed the seams of the passenger doors, where Barney eventually indicated drug odors were present, he did not vary his pace in any significant way. As he continued to walk along the car, Officer Blake stated that Barney paused at the door seam and refused to follow him. Officer Blake recognized Barney's alert behavior at this point—his body went rigid and he began sniffing the seam intently. Then, Barney sat down.

In the Court's view, the video largely supports Officer Blake's version of events. Contrary to Mr. Jimenez' opinion, the Court does not see any sudden change in movement by Officer Blake before Barney sits down. As Officer Blake moves further toward the front of the car, the video shows Barney pause near the middle of the passenger side of the vehicle. This is significant because it is the only time in the search when Barney resists following closely behind Officer Blake. And although Officer Blake does drop out of view of the camera, the Court cannot say that this movement *caused* Barney to sit—the two events happened nearly simultaneously. Thus, in the Court's view, the dashcam video does not show that Officer Blake caused Barney to sit outside the passenger doors of Mr. Morales' car.

That the sniff search was very short (about 20 seconds) and that Officer Blake rewarded Barney by saying "good boy" even though he was not certain drugs were present in the vehicle gives the Court some pause. However, considering the "totality of the circumstances," as the Court must do when it evaluates whether probable cause existed, the Court concludes that Barney's indication was sufficiently reliable to establish probable cause. *Harris*, 133 S. Ct. at 1055. The government presented evidence that Barney was able to identify drugs reliably in controlled settings. Officer Blake testified that he observed Barney alert at the seam between the

doors on the passenger side of Mr. Morales' car, that he refused to move from the seam, and that he then sat down, his indication behavior. The video evidence does not contradict Officer Blake's testimony or show any improper influence from him. The Court therefore rejects Mr. Morales' argument that the sniff search was unreliable because Officer Blake improperly influenced Barney's behavior.

### C. Did Barney's alert on the passenger side of Mr. Morales' car provide probable cause to search the trunk?

Mr. Morales' final argument is that Officer Blake lacked probable cause to search the trunk of Mr. Morales' car, where he discovered drugs, because Barney alerted only to the passenger side of the vehicle. But Mr. Morales concedes, as he must, that the Tenth Circuit has rejected this very argument. In *United States v. Rosborough*, our Circuit said: "[W]e hold that a canine alert toward the passenger area of a vehicle gives rise to probable cause to search the trunk as well . . . ." 366 F.3d 1145, 1153 (10th Cir. 2004). Recognizing this precedent, Mr. Morales states that he "advances this argument as a good faith request for a necessary change in the law . . . ." Doc. 15 at 19. This Court is bound to follow Tenth Circuit precedent, *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit . . . ."), so the Court rejects Mr. Morales' argument that Barney's alert at the passenger side of Mr. Morales' car did not provide probable cause to search the trunk.

### III. Conclusion

The Court denies Mr. Morales' motion to suppress. Officer Blake had reasonable suspicion to stop Mr. Morales' vehicle for violating K.S.A. § 8-1522, and Barney's indication that he smelled drug odors provided probable cause to search the trunk of Mr. Morales' car, where officers discovered 1.1 pounds of suspected MDMA.

15

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Morales' Motion to Suppress Evidence (Doc. 15) is denied.

**IT IS SO ORDERED.**

**Dated this 8th day of May, 2015, at Topeka, Kansas.**

                                              **s/ Daniel D. Crabtree**
                                              **Daniel D. Crabtree**
                                              **United States District Judge**